UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

**DEIDRA LOPEZ,**

    **Plaintiff,**

    v.

**UNITED STATES OF AMERICA,**    Civ. No. 20-11639 (KM) (ESK)

    **Defendant.**    OPINION

### KEVIN MCNULTY, U.S.D.J.:

    Plaintiff Deidra Lopez commenced this action against the United States of America to recover damages resulting from the alleged medical negligence of health care providers at North Hudson Community Action Corporation ("NHCAC"), a federally qualified health center ("FQHC") located in New Jersey.[1] Ms. Lopez claims that NHCAC providers failed to detect a fibroid in her uterus during a series of visits between January 2016 and January 2017, setting in motion a chain of events that culminated in her receiving an unnecessary hysterectomy several months later. That hysterectomy was performed by another obstetrics and gynecology ("OBGYN") practitioner, not affiliated with NHCAC, whom Lopez is suing in a separate, state court malpractice action.

    Now before the Court is the Government's motion for summary judgment (DE 26). For the reasons expressed below, the Government's motion for summary judgment is **GRANTED** in part and **DENIED** in part.

---

[1] The United States is named as defendant because, under the Public Health Service Act, 42 U.S.C. § 233, the United States is liable for personal injury caused by the negligence of an FQHC or its employee where a private person would likewise be liable. This Court has exclusive subject matter jurisdiction over such cases pursuant to the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 1346.

I. **BACKGROUND**[2]

**A. Facts**

This case arises out of OBGYN care that Deidra Lopez received from health care providers at NHCAC between January 2016 and 2017.[3] Lopez visited the facility six times during the relevant time period; on three of those occasions, she received a cervical screening.

The first cervical screening took place during an OBGYN visit on January 25, 2016. (Def. St. ¶ 56; Pl. Resp. ¶ 56.) During the visit, Dr. Manuel Borja conducted a physical examination of Lopez, including a Pap smear procedure, a visual and manual pelvic exam, and a palpation of Lopez's lower abdomen to feel for her uterus. (Def. St. ¶ 57; Pl. Resp. ¶ 57.) NHCAC's records indicate that Lopez's uterus was of "normal size/shape/consistency" and that the examination as a whole was "without abnormal finding." (Def. St. ¶ 58; Pl. Resp. ¶ 58.) Lopez returned to NHCAC on February 10, 2016 to consult with Dr. Borja about an abnormal result from the Pap smear that was conducted during her January 25, 2016 visit. (Def. St. ¶ 66; Pl. Resp. ¶ 66.) Following this

---

[2]   Certain citations to record are abbreviated as follows:

"DE" = Docket entry number in this case

"Mot." = Brief of the United States in Support of its Motion for Summary Judgment under Rule 56 (DE 26-2)

"Def. St." = Defendant's Statement of Material Facts Not in Dispute Pursuant to L. Civ. R. 56.1 (DE 27)

"Opp." = Plaintiff's Brief in Opposition to the Motion for Summary Judgment (DE 29)

"Pl. Resp." = Plaintiff's Response to Defendant's Statement of Material Facts (DE 30)

"Wheeler Opinion" = Expert opinion of Dr. James Wheeler, dated October 14, 2021 for Plaintiff (DE 27-12)

"Marcus Opinion" = Expert opinion of Dr. Jenny Marcus, dated December 1, 2021 for the United States (DE 27-14.)

[3]   Lopez had received care at the NHCAC numerous times, but her January 2016 visit was the first time she had received care at the facility in over four years. (Def. St. ¶ 56; Pl. Resp. ¶ 56.)

discussion, Dr. Borja recommended that Lopez return for another Pap smear in one year. (Def. St. ¶ 68; Pl. Resp. ¶ 68.)

The second screening took place on July 5, 2016, when Lopez visited NHCAC for unrelated issues but separately met with her OBGYN provider, Dr. Borja. During that visit, Dr. Borja conducted a hands-on pelvic examination from which he found that Lopez's uterus was again of "normal size, shape and consistency." (Def. St. ¶ 71; Pl. Resp. ¶ 71.)

The third screening took place on January 10, 2017 when Lopez visited Dr. Borja at NHCAC for an annual OBGYN examination. The examination included a Pap smear and a hands-on pelvic examination from which Dr. Borja found that Lopez's uterus was once again of "normal size, shape and consistency." (Def. St. ¶ 73; Pl. Resp. ¶ 73.)

NHCAC did not determine that Lopez had a uterine fibroid during any of her visits to NHCAC.[4]

On July 19, 2017, approximately six months after her last OBGYN visit at NHCAC, Lopez sought care in the Emergency Department at Hackensack University Medical Center ("Hackensack UMC"), reporting that she had been experiencing abdominal pain, right lower back pain, and diarrhea for

---

[4] Lopez's medical records indicate that several years earlier, on May 25, 2011, she visited Hackensack UMC's Emergency Department and received an abdominal CT scan that showed "enlargement of the uterus with a lobulated contour, most likely representing fibroids." (Def. St. ¶ 32; Pl. Resp. ¶ 32.) Lopez testified that she was unaware of the uterine finding on this CT scan and therefore never informed NHCAC about it. (Def. St. ¶ 33; Pl. Resp. ¶ 33.) During another visit to the Hackensack UMC Emergency Department on October 20, 2014, an abdominal CT scan showed that Lopez had an "[e]nlarged heterogeneous uterus [and] 7.6 cm area of increase density seen in the left side of the uterus which likely represents a uterine myoma. Further evaluation with pelvic ultrasound recommended." (Def. St. ¶ 45; Pl. Resp. ¶ 45.) Again, Lopez testified that she was unaware of these findings and therefore never informed NHCAC about them. (Def. St. ¶ 46; Pl. Resp. ¶ 46.) Lopez contends that NHCAC's failure to detect her uterine fibroid is in part a result of NHCAC's failure to determine Lopez's interval medical history over the course of her six visits during the relevant time period. (Opp. at 3-4; Wheeler Report at 15-16.) Lopez also contends that NHCAC's staff ignored Lopez's complaints of abdominopelvic pressure and pain, which should have led them to discover her uterine fibroid. (Opp. at 2.)

approximately two weeks.[5] (Def. St. ¶ 80; Pl. Resp. ¶ 80.) Hackensack UMC conducted a CT scan and a pelvic ultrasound, which revealed that Lopez had a uterine fibroid, specifically "a large myoma involving the uterine fundus and body anteriorly which measures 16.9 cm x 9.9 cm x 13.7 cm." (Def. St. ¶ 84; Pl. Resp. ¶ 84.) Hackensack UMC staff reviewed these findings with Lopez and advised her to "follow up with [an] OBGYN." (Def. St. ¶ 85; Pl. Resp. ¶ 85.) Lopez accordingly followed up with Dr. Amanda Ganza, an OBGYN affiliated with Hackensack UMC regarding the uterine findings.[6] (Def. St. ¶ 86; Pl. Resp. ¶ 86.) Dr. Ganza recommended a hysterectomy and bilateral salpingectomy surgery to address the fibroid. (Def St. ¶¶ 9, 88; Pl. Resp. ¶¶ 9, 88.) According to Lopez, Dr. Ganza informed her that this procedure was Lopez's only treatment option and did not adequately explain the nature of the surgery to her.[7] (*Id.*)

Lopez did not consult with any NHCAC health care providers about the surgery proposed by Dr. Ganza, nor did she notify NHCAC that the surgery was going to take place.[8] (Def. St. ¶ 90; Pl. Resp. ¶ 90.) Moreover, Lopez did not seek a second opinion regarding the surgery Dr. Ganza proposed to address the uterine fibroid. (Def. St. ¶ 91; Pl. Resp. ¶ 91.) On August 18, 2017, Dr. Ganza performed a hysterectomy and bilateral salpingectomy on Lopez. (Def. St. ¶ 94; Pl. Resp. ¶ 94.)

---

[5]     Lopez testified that she began experiencing these and other symptoms while on vacation in the Dominican Republic around July 4, 2017. Her other symptoms included nausea, vomiting, and an "enlarged feeling" in her stomach. (Def. St. ¶¶ 76-77; Pl. Resp. ¶¶ 76-77.)

[6]     Lopez never informed NHCAC about the findings from this CT scan and pelvic ultrasound conducted by Hackensack UMC. (Def. St. ¶ 87; Pl. Resp. ¶ 87.)

[7]     Lopez is suing Dr. Ganza and Hackensack UMC in a parallel action currently pending in state court. Lopez alleges that Dr. Ganza "could have removed her fibroid without conducting a total abdominal hysterectomy and bilateral salpingectomy," but she "was not advised that such an option existed." (Opp. Ex. 1 at 6-7.)

[8]     According to Lopez, "NHCAC knew about the total abdominal hysterectomy from [her] insurance before the hysterectomy took place." (Pl. Resp. ¶ 90.)

Lopez asserts that negligence by NHCAC, together with negligence by Hackensack UMC and Dr. Ganza, all caused Lopez 1) to receive a hysterectomy that she did not want and did not need, 2) to become sterile, and 3) to suffer from ongoing post-operative complications. (Def. St. ¶ 94; Pl. Resp. ¶ 94.)

### B. Procedural History

On June 28, 2019, Lopez filed suit against NHCAC for medical malpractice, and against Hackensack UMC and Dr. Ganza for 1) medical malpractice and 2) failure to obtain Lopez's informed consent in light of Dr. Ganza's alleged failure to inform Lopez of reasonable alternative treatment options (the "State Court Action"). (Def. St. ¶ 3; Pl. Resp. ¶ 3.) On October 6, 2019, the United States removed the case to this Court, and on January 27, 2020, the United States successfully moved to dismiss Lopez's claim against NHCAC for lack of jurisdiction given Lopez's failure to exhaust administrative remedies. (Def. St. ¶ 5; Pl. Resp. ¶ 5.) On January 28, 2020, Hackensack UMC and Dr. Ganza successfully moved to remand the claims against them to New Jersey Superior Court. (*Id.*)

On August 27, 2020, after pursuing administrative remedies, Lopez initiated the present federal action against the United States. (DE 1.) On November 16, 2020, the Government answered the complaint. (DE 7.) The parties completed discovery in late 2021. On March 11, 2022, the Government moved for summary judgment. (DE 26.) On March 21, 2022, Lopez opposed the Government's motion. (DE 29.) On March 31, 2022, the Government filed a reply brief in support of its motion for summary judgment. (DE 34.) The Government's motion for summary judgment is fully briefed and ripe for decision.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a

material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment. *See id.*

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A party asserting that a fact [is not] genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . ., affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F.Supp.2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)). "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250-51.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F. 3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In that respect,

the Court's role in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## III. DISCUSSION

In its motion to dismiss, the Government argues that it is entitled to summary judgment because 1) Lopez cannot prove NHCAC proximately caused her injury, in part because Dr. Ganza's alleged negligence constitutes a superseding cause; and 2) Lopez has not established that NHCAC has breached a cognizable standard of care. The Government further argues that it is immune from suit under Section 7 of the New Jersey Charitable Immunity Act ("NJCIA"), or alternatively, that it is entitled to a damages cap of $250,000 under Section 8 of the NJCIA. In the following discussion, I address the Government's merits arguments regarding Lopez's negligence claim first before moving on to the arguments it raises under the NJCIA.

### A. Lopez's Negligence Claim

There are several genuine, disputed issues of material fact that bear on Lopez's negligence claim, involving the applicable standard of care during Lopez's visits to NHCAC, the extent to which NHCAC deviated from that standard of care, and the extent to which NHCAC's alleged failure to detect Lopez's fibroid was a proximate cause of her injury. Summary judgment on Lopez's negligence claim is therefore inappropriate.

A medical malpractice suit is "a kind of tort action in which the traditional negligence elements are refined to reflect the professional setting of a physician-patient relationship. Thus, a plaintiff in a malpractice action must prove the applicable standard of care; that a deviation has occurred; and that the deviation proximately caused the injury." *Verdicchio v. Ricca*, 179 N.J. 1, 23 (2004) (citations omitted). "New Jersey, like many jurisdictions, has adopted a modified standard—the substantial factor standard—'limited to that class of

cases in which a defendant's negligence combines with a preexistent condition to cause harm—as distinguished from cases in which the deviation alone is the cause of harm.'" *Id.* at 24 (citing *Battenfeld v. Gregory*, 247 N.J. Super. 538, 549 (App. Div. 1991)); *Scafidi v. Seller*, 119 N.J. 93, 108–09 (1990).

The appropriate inquiry under the substantial factor test is "whether the defendant's deviation from the standard medical practice increased a patient's risk of harm or diminished a patient's chance of survival and whether such increased risk was a substantial factor in producing the ultimate harm." *Verdicchio*, 179 N.J. at 24 (quoting *Gardner v. Pawliw*, 150 N.J. 359, 376 (1997)); *Scafidi*, 119 N.J. at 108–09. Accordingly, in a failure-to-diagnose case, a plaintiff must demonstrate that the defendant's deviation from the standard of care was a cause "in fact" of, or increased the risk of harm from, the preexisting condition. The question then becomes whether "the deviation, in the context of the preexistent condition, was sufficiently significant in relation to the eventual harm." *Scafidi*, 119 N.J. at 109. A defendant's deviation need not be the only cause to constitute a substantial factor; rather, "[i]t must play a role that is both relevant and significant in bringing about the ultimate injury." *Reynolds v. Gonzalez*, 172 N.J. 266, 288 (2002); *Verdicchio*, 179 N.J. at 30.

Here, Lopez maintains that NHCAC deviated from the applicable standard of care by 1) failing to discover she had a uterine fibroid during her three cervical screenings between January 2016 and January 2017, and 2) failing to review her interval medical history, which would have revealed that she had previously received two CT scans at Hackensack UMC, one in 2011 and one in 2014, both of which suggested that she had a uterine fibroid.[9] Lopez further maintains that this alleged deviation was the proximate cause of her harm because NHCAC's failure to diagnose her uterine fibroid was a "substantial factor" in bringing about her ultimate injury, an unwanted

---

[9] As noted *supra*, Lopez also contends that NHCAC providers ignored her complaints of abdominopelvic pressure, which should have led them to discover her uterine fibroid. (Opp. at 2.)

hysterectomy that has rendered her sterile and that resulted in post-operative complications.

In its motion, the Government argues that it is entitled to summary judgment because 1) Lopez cannot prove NHCAC's negligence caused her injury, in that Dr. Ganza's alleged negligence constitutes the proximate or superseding cause; and 2) Lopez has not established that NHCAC has breached a cognizable standard of care. These arguments are unavailing, and I address each of them in turn.

### 1. Proximate Cause

The Government argues that Lopez's negligence claim fails as a matter of law because she cannot prove that NHCAC's failure to detect Lopez's fibroid was a substantial factor in bringing about her alleged harm. Under the substantial factor test set forth above, the Court must determine 1) whether NHCAC's failure to detect Lopez's uterine fibroid was a cause in fact, or increased the risk, of her harm, and if so, 2) whether that failure was "both relevant and significant in bringing about the ultimate harm." *Reynolds v. Gonzalez*, 172 N.J. 266, 288 (2002); *Scafidi*, 119 N.J. at 109.

As an initial matter, it is critical to characterize Lopez's harm properly prior to conducting the substantial factor analysis. The Government construes Lopez's harm too narrowly, asserting that the only injury Lopez alleges is that which stems from the purported malpractice of Dr. Ganza—as the Government sees it, Lopez alleges only that she received a hysterectomy without being adequately informed as to the nature of the procedure or the alternative treatment options available to her. (Mot. at 7.) But given the sequence of events, the harm resulting from *NHCAC*'s negligence is independently identified. Lopez argues that if NHCAC had identified her fibroid, she would not have ended up in a position where a hysterectomy would even be a treatment worth considering. In other words, she "would have had more options available to her," including "more probable options of uterine preservation." (Opp. at 5.)

9

Moving on to the substantial factor test, factual questions remain as to whether NHCAC's failure to detect Lopez's fibroid was the cause in fact of her losing the chance to pursue less drastic intermittent treatment options. The Government asserts that this is not so because "expectant management" is an acceptable and common approach for treating patients with non-symptomatic fibroids, so NHCAC's purported negligence was of no consequence. (Mot. at 14.) This argument, whatever its merits, does not surmount the summary judgment threshold. The Government's expert, Dr. Jenna Marcus, opined that such a "wait and see" method "is an option for patients who are asymptomatic" as "studies demonstrate no meaningful difference in fibroid size or bleeding characteristics over a one-year period in patients undergoing expectant management." (Marcus Opinion at 7.) Dr. Marcus concluded based on the record here that "[s]hould Ms. Lopez's fibroid have been detected by NHCAC before Lopez's July 2017 CT scan at Hackensack, she could have been offered expectant management ('wait and see') within the standard of care, with possible procedural/surgical management to follow if she was found to be symptomatic." (*Id.* at 9.) But the fact that Lopez *could* have been offered expectant management does not mean she would have been, or that she would have agreed to that option. And even if she was told to "wait and see," NHCAC, being aware of Lopez's condition, would likely have monitored the fibroid for further growth or the onset of any symptoms or complications. Whether such monitoring would have led NHCAC to respond to Lopez's symptoms sooner, and whether Lopez would have pursued earlier intervention are questions of fact that preclude summary judgment here.

Relatedly, the Government asserts that the allegedly negligent actions of Dr. Ganza constitute a superseding cause that cuts off liability on the part of NHCAC for its own alleged negligence in failing to diagnose Lopez's uterine fibroid. (Mot. at 8-13.) This argument fails for similar reasons. Under New Jersey law, "the doctrine of superseding cause focuses on whether events or conduct that intervene subsequent to the defendant's negligence are sufficiently unrelated to or unanticipated by that negligence to warrant

10

termination of the defendant's responsibility." *Lynch v. Scheininger,* 162 N.J. 209, 230 (N.J. 2000). The *Lynch* court found that the Second Restatement's definition of a superseding event is "simple and straightforward":

> A superseding cause relieves the actor from liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm. Therefore, if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated, there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm.

*Id.* at 226 (quoting Restatement (Second) of Torts § 440 comment b (Am. Law Inst. 1965)). Courts resolve questions of superseding cause by "focusing on whether the intervening cause is so closely connected with the defendant's negligent conduct that responsibility should not be terminated," *id.* at 227 or, conversely, whether the intervening cause is so attenuated from defendant's negligent conduct that responsibility should be terminated. "The shorthand term for that inquiry is whether the intervening cause is 'foreseeable.'" *Id.*

The Government frames the analysis according to its narrow formulation of Lopez's alleged harm. According to the Government, the relevant inquiry is whether Dr. Ganza's alleged *malpractice* was a foreseeable result of NHCAC's actions. (Mot. at 8-9.) A more appropriate question would be whether Lopez's receiving a compete hysterectomy/salpingectomy was a foreseeable result of

11

NHCAC's failure to detect her fibroid during her 2016 and 2017 visits.[10] That could be true irrespective of whether Dr. Ganza committed malpractice.[11]

In sum, the issues of proximate or superseding cause present issues of fact unsuitable for resolution on summary judgment.

### 2. Deviation from Applicable Standard of Care

The Government argues further that Lopez's negligence claim fails as a matter of law because she has not established that NHCAC has breached a cognizable standard of care.

---

[10] The Restatement, as adopted by the *Lynch* court, enumerates six considerations that a court should consider in determining whether an intervening force is a superseding cause of harm to another: (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence; (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation; (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation; (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act; (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him; (f) the degree of culpability of a wrongful act of a third person which sets the intervening act in motion. Restatement (Second) of Torts § 442 (1965). These considerations generally weigh against a finding that Dr. Ganza's actions constituted a superseding or independent cause of Lopez's alleged harm. For instance, Dr. Ganza's actions did not bring about a different kind of harm than that which would have resulted from NHCAC's purported negligence. It would be reasonable to expect that at some point, emergent treatment might be required as a previously-undetected fibroid grew larger and became symptomatic. Moreover, as noted, while subsequent malpractice could be characterized as extraordinary, the need for a highly invasive medical intervention to address a condition that went undetected and untreated could not. Critically, the extent to which Lopez's condition required a hysterectomy or another surgical procedure was related to NHCAC's failure to detect her fibroid remains to be determined.

[11] Procedural quirks have resulted in the malpractice case against Dr. Ganza being pursued in separate, state-court proceedings. Ms. Lopez faults Dr. Ganza for failing to present or pursue less drastic options. It appears, however, that Dr. Ganza would state that the situation had become emergent, requiring surgery. (*See* Opp. at 1, 4–5.) That issue cannot be resolved in the context of this summary judgment motion.

As the Government itself points out, Ms. Lopez's expert, Dr. James Wheeler, agrees with the Government's expert, Dr. Marcus, that a "frontline OBGYN should seek medical history from the patient including a history of past medical encounters, serious illnesses, hospitalizations or emergency department visits, and recent gynecological facts including OBGYN visits and procedures." (Mot. at 23-24 (citing Wheeler Opinion at 10).) According to the Government, "the uncontested NHCAC records demonstrate that its providers took an appropriate history at each visit from January 25, 2016 to January 10, 2017." (Mot. at 25.) This conclusory statement does not eliminate the possibility that Lopez's interval history was taken incorrectly or incompletely at one or more of Lopez's six visits to NHCAC. Moreover, Dr. Wheeler opined that given Lopez's psychiatric condition (bipolar disorder), the proper standard of care would have included NHCAC making "even greater effort at obtaining her history, prior records and imaging." (*Id.* at 17.) The Government's point is well-taken that NHCAC's duty did not extend to making a thorough investigation of the veracity of Lopez's statements regarding her interval medical history, or cold-calling local hospitals regarding any treatment Lopez may have received. (Mot. at 30) Nevertheless, factual questions remain regarding the appropriate standard for determining a patient's medical history and whether NHCAC staff deviated from that standard under the circumstances of this case. The Government's argument that Lopez has not established that NHCAC has breached a cognizable standard of care therefore fails.[12]

\* \* \*

There are several genuine, disputed issues of material fact that bear on Lopez's negligence claim. Summary judgment is therefore inappropriate and, except as to its alternative argument for a damages cap under the NJCIA (*see* Section III.B., *infra*), the Government's motion will be denied.

---

[12] Those circumstances include Lopez's mental condition and her allegation that NHCAC ignored her complaints of abdominopelvic pressure. (Opp. at 2)

13

### B. Immunity under the NJCIA

The Government separately argues that it is immune from suit under Section 7 of the NJCIA, or alternatively, that it is entitled to a damages cap of $250,000 under Section 8 of the NJCIA. For the same reasons articulated by Judge Cecchi in her recent decision involving a medical malpractice claim against NHCAC, *D.L. v. United States*, No. CV 20-3214, 2021 WL 4170047 (D.N.J. Sept. 14, 2021), I find that the Government is entitled to invoke the Section 8 statutory damages cap. Accordingly, I will award the Government partial summary judgment on that basis.

Under the Eleventh Amendment, "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XL. The United States Supreme Court has interpreted the Eleventh Amendment as affirming "the fundamental principle of sovereign immunity" as a limit on a federal court's judicial authority. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984).

Consequently, a federal court may exercise jurisdiction over suits against the United States only if, and to the extent, that Congress has waived the United States' immunity to suit. *United States v. Craig*, 694 F.3d 509, 511 (3d Cir. 2012). Congress waived the Government's immunity to suit here under the FTCA, which "does not itself create a substantive cause of action against the United States; rather, it provides a mechanism for bringing a state law tort action against the federal government in federal court." *Lomando v. United States*, 667 F.3d 363, 372–74 (3d Cir. 2011). "Accordingly, 'the extent of the United States' liability under the FTCA is generally determined by reference to state tort law.'" *Id.*

Specifically, the party bringing a claim under the FTCA must satisfy the six threshold requirements of 28 U.S.C. § 1346(b)(l). *See Gremminger v. United States*, 2017 WL 1170853, at *3 (D.N.J. Mar. 29, 2017). The FTCA claim must

14

be made 1) against the United States, 2) for money damages, 3) for injury or loss of property, or personal injury or death (4) caused by the negligent or wrongful act or omission of any employee of the Government (5) while acting within the scope of his office or employment, (6) under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. *Id.*

With respect to the final criterion, neither party disputes that New Jersey negligence law applies here, or that the Government "stands in the shoes" of NHCAC and its employees, and thus can assert "any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim." *Id.* (citing 28 U.S.C. § 2674). Based on the Government's alternative arguments for either absolute immunity or a damages cap,[13] the Court must determine whether Section 7 or 8 applies here. *See Joseph v. Vaydovsky*, No. 17-927, 2018 WL 5095990, at *5 (D.N.J. Oct. 18, 2018) ("The most prominent distinction between nonprofit entities organized exclusively for charitable . . . purposes under Section 7 and nonprofits organized exclusively for hospital purposes under Section 8 is that the former are immune from liability while the latter are subject to liability for negligence, albeit with a cap on its damages.") (citations omitted).

### 1. Section 7 (Absolute Immunity)

Section 7 shields a defendant from tort liability where it "(1) was formed as a nonprofit corporation, society, or association; (2) is organized exclusively for ... charitable ... purposes; and (3) was advancing those purposes at the time

---

[13] Lopez argues that summary judgment is not appropriate with respect to the Government's NJCIA defenses because disputed factual issues remain as to the purposes for which NHCAC is organized and whether it organizes its affairs consistent with its stated purpose. (Opp. at 13-17.) However, Lopez presents no evidence to rebut that which has been presented by the Government. I find that the record is developed enough for me make a determination as to NJCIA defenses at the summary judgment stage.

15

of the injury to plaintiff who was then a beneficiary of the charitable works." *See Gremminger*, 2017 WL 1170853, at *5 (citations omitted).

Courts "conduct a factual analysis beyond the benevolent acts" of the defendant at issue when the charitable purpose requirement under Section 7 is in dispute. *See Gremminger*, 2017 WL 1170853, at *5 (citations omitted). In particular, courts look to a defendant's "funding, charter, daily operations, relationships to other entities, and the extent to which [the defendant] lessens a burden on the government." *Id.* (citations omitted). Ultimately, "[t]he essence of the public policy favoring charitable immunity is the preservation of private charitable contributions for their designated purposes," and, accordingly, the "essential characteristic" of an entity organized exclusively for charitable purposes within the meaning of Section 7 is the receipt of "a substantial amount" of charitable contributions from private donors. *Id.* at 7 (citations omitted).

Here, Defendant argues that NHCAC was organized exclusively for charitable purposes because, *inter alia*, it 1) receives contributions from private donors; 2) provides medical and other social services to underserved communities, often at little to no cost; and 3) its incorporation documents and tax filings demonstrate a charitable purpose. (Mot. at 42-51.)

The Court does not write on a clean slate here. The Government concedes that its argument for absolute immunity under Section 7 is contrary to the holdings of other judges within this District concerning medical malpractice suits against federally qualified health centers, including Judge Cecchi's recent decision involving NHCAC specifically. (Mot. at 32; *see D.L. v. United States*, 2021 WL 4170047 at *3–*4.) Such entities have been found not to have been organized exclusively for charitable purposes. In accordance with the relevant case law and its application to the facts of this case, then, I find that the Government is not entitled to invoke Section 7 immunity.

### 2. Section 8 (Damages Cap)

In the alternative, and more convincingly, the Government argues that this Court should find its liability to be capped at $250,000 under Section 8 of the NJCIA. I agree.

Section 8 limits an entity's liability to $250,000 for negligence claims brought under New Jersey law where the entity 1) "is formed as a nonprofit corporation"; 2) "is organized exclusively for hospital purposes"; 3) "was promoting those objectives and purposes at the time the plaintiff was injured"; and 4) "the plaintiff was a beneficiary of the activities of the hospital." *Gremminger*, 2017 WL 1170853, at *5 (citations limited).

The sole disputed issue under Section 8 here involves the second prong, *i.e.*, whether NHCAC "is organized exclusively for hospital purposes."[14] This district has routinely embraced an expansive definition of "hospital purposes" under Section 8 to include FQHCs, like NHCAC, that represent the "modern hospital," *i.e.*, one that offers a hybrid model of medical and non-medical services to patients regardless of their ability to pay. *See, e.g., id.* (FQHC was entitled to the NJCIA's $250,000 cap on damages under Section 8 where it depicted the "modern hospital" by offering various medical and non-medical services to underserved communities); *Mendez v. United States*, No. CV 14-7778, 2017 WL 1882472, at *3-5 (D.N.J. May 9, 2017) (same); *S.M. v. United States*, No. CV 13-5702, 2016 WL 7374530, at *2-6 (D.N.J. Dec. 20, 2016) (same); *Joseph*, 2018 WL 5095990, at *6-8 (D.N.J. Oct. 18, 2018) (same). Indeed, Judge Cecchi, while rejecting Section 7 charitable immunity, found that NHCAC specifically represented the "modern hospital" in this way, warranting a damages cap under Section 8. *See D.L. v. United States,* 2021 WL 4170047 at *5.

Accordingly, I find that NHCAC is organized exclusively for hospital purposes within the meaning of Section 8 and that the other criteria are

---

[14] *Compare* Section 7 immunity, discussed *supra*, which requires that the entity be organized exclusively for "charitable" purposes.

concededly satisfied. The Government's liability is capped at $250,000, and summary judgment is granted to that extent.

## IV. CONCLUSION

For the reasons set forth above, the Government's motion for summary judgment is **GRANTED** in part and **DENIED** in part. The Government is awarded partial summary judgment as to its alternative request for a damages cap of $250,000 under Section 8 of the NJCIA. The Government's motion is denied in all other respects.

An appropriate order follows. This Opinion is filed under temporary seal, as provided in the order.

Dated: December 28, 2022

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**